1
2
3
4                    UNITED STATES DISTRICT COURT

5                   NORTHERN DISTRICT OF CALIFORNIA

6

7    DAVID DELUCA, et al.,                    Case No.17-cv-00034-EDL

8                    Plaintiffs,

                                              **ORDER ON CROSS-MOTIONS FOR**
9         v.                                  **SUMMARY JUDGMENT**

10   FARMERS INSURANCE EXCHANGE,              Re: Dkt. Nos. 125, 128

11                   Defendant.

12        The parties to this employee misclassification case arising under the Federal Labor

13   Standards Act ("FLSA") and California, Michigan, and New York state law filed cross motions

14   for summary judgment.  As discussed below in great detail, the Court resolves the cross motions

15   for summary judgment as follows:

16        • GRANTS Plaintiffs' motion for summary judgment on the administrative exemption and
17          DENIES Farmers' cross motion for summary judgment on the administrative exemption.

18        • DENIES Plaintiffs' motion for summary judgment on willfulness.

          • DENIES Plaintiffs' motion for summary judgment on liquidated damages.

19        • GRANTS Plaintiffs' motion for summary judgment on the calculation of FLSA damages
20          at 1.5x.

21        • GRANTS Farmers' motion for summary judgment on Plaintiff Laughlin's FLSA claim.

          • DENIES Plaintiffs' motion for summary judgment on the Section 203 waiting time
22          penalties.

23        • DENIES Plaintiffs' motion for summary judgment on the meal period claim.

          • GRANTS Plaintiffs' motion for summary judgment on the itemized wage claims under
24          New York (N.Y. Lab. Law § 195(3)) and California Law (Cal. Lab. Code § 226(a)(2)) and
            the claim that Farmers failed to provide Plaintiff Laughlin with required information about
25          the timing, method, and amount of pay when she was hired, as required by New York
26          Labor Law § 195(1).

27        • DENIES Farmers' motion for summary judgment on the California unfair competition law
            claim.

28

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## I.    FACTUAL BACKGROUND

The following facts are undisputed, except where noted.  There are approximately 80 individual Plaintiffs in this case as special investigators employed by Farmers, comprised of approximately 40 named Plaintiffs and Opt-In Plaintiffs (members of the FLSA collective) and 57 Federal Rule of Civil Procedure 23 California-based class members, 17 of whom are also Opt-In Plaintiffs (collectively, "Plaintiffs").  Defendant Farmers Insurance Exchange ("Farmers" or "FIE") is an inter-insurance exchange that sells homeowners insurance, auto insurance, commercial insurance, and financial services throughout the United States.  Am. Compl., ¶ 9; Am. Answer, ¶¶ 9, 10.  Farmers is the only entity that employed special investigators, including all Plaintiffs and absent class members.  Gendell Decl., ¶¶ 5-6 (Head Human Resources Business Partner—Claims for Farmers Group, Inc.); Ex. 8, Masuen Dep. at 37:11-16; Ex. 15, Serafin Dep. at 121:25-122:16.

### A.    Special Investigations Unit's Purpose and Structure

Farmers' Special Investigations Unit ("SIU") provides investigatory services to Farmers' Claims Organization ("Claims") when fraud is suspected in the submission of any insurance claim.  Ex. 18, Wedding[1] Decl., ¶ 2.  SIU's purpose is to "educate, identify, detect, [and] resist fraudulent payments, or attempts to defraud the company through the insurance claims process."  Ex. 15, Serafin[2] Dep. at 123:5-8.  SIU's "calculated impact" in deterring fraud is valued at approximately $50-60 million per year while it operates on a budget of approximately $28 million.  Ex. 15, Serafin Dep. at 124:11-17.

In the SIU hierarchy of employees, special investigators are at the lowest level.  Ex. 31, Wedding Depo. at 41:19-25.  Special investigators report to SIU Managers ("SIMs")[3] (5-7 in each

---

[1] Kamala Wedding testified as Farmers' corporate representative for a Rule 30(b)(6) deposition. She has been the SIU Director since the July of 2015.  Ex. 31, Wedding Dep. at 7:11-15; 34:16-18.

[2] Sean Zavala-Serafin was the SIU Director from 2013 to 2015.  Ex. 30, Serafin Dep. at 9:17-22.

[3] A senior special investigator might step in to serve as the "acting SIM" when the assigned SIM is unavailable.  Ex. 2, Francis Dep. at 62:7-64:25.

zone), who report to five Zone Managers, who report to the SIU Director.  Ex. 31, Wedding Dep. at 39:18-25.  The five zones are: east, central, west, centralized support, and national.  Id. at 40:19-21.  According to Plaintiffs, the special investigators in this case are or were in the east, central, and west zones.  Special investigators are salaried employees and, during the relevant period, no special investigator employed by Farmers in California made less than $49,920 per year and some made more than $100,000 annually.  Rupert[4] Decl., ¶ 5, Ex. 2; Francis Dep. at 96:15-20 (salary of approximately $110,000 when he left Farmers).  Some Plaintiffs testified that they understood at the time they were hired that the special investigator position was overtime exempt and that they would be paid the same salary regardless of the number of hours worked.  Ex. 7, Grimes Dep. at 32:16-20, 33:2-8, 35:11-21, 155:5-8; Ex. 6, Reyes Dep. at 32:7-11, 37:7-21; Ex. 4, Daszko Dep. at 51:15-18, 56:19-57:2; Ex. 21, Hsieh[5] Decl., ¶ 3.

Out of the millions of claims for insurance benefits filed by Farmers' insureds every year, approximately 2% of those claims are referred to SIU for investigation.  Ex. 15, Serafin Dep. at 122:17-123:1.  The role of special investigators is to "investigate potentially fraudulent claims, resolve indicators of fraud, and to help Farmers from paying out on illegitimate claims."  Ex. 19, Bear[6] Decl., ¶ 5.  They "conduct investigations into those claims, they resolve the indicators and then they report their findings to the CR [claims representative] for them to make a decision."  Ex. 24, Martinez Dep. at 34:9-11.  Sometimes the insurance claims they investigate involve millions of dollars.  Ex. 7, Grimes Dep. at 72:12-22 (worked several claims exceeding $1 million); Ex. 4, Daszko Dep. at 145:19-146:3 (investigated $2.5 million property claim involving stolen microchips).  Special investigators are expected to collaborate with their "customers," the claims

---

[4] Tami Rupert is a Senior Human Resources Coordinator who is employed by Farmers Group, Inc. Rupert Decl., ¶ 1.  In this capacity, she provides human resources services for Farmers Group, Inc. and Farmers.  Id.

[5] Inge Hsieh has been a special investigator in Northern California since October 2016.  Ex. 21, Hsieh Decl., ¶ 2.

[6] David Bear is a SIM for Farmers and has worked in SIU since June 2012, starting as a special investigator and working his way up to SIM.  Ex. 19, Bear Decl. ¶ 2.

United States District Court
Northern District of California

representatives.  Ex. 28, Page[7] Dep. at 18:12-17.  Several Farmers employees testified that investigating claims is the special investigators' main responsibility.  Ex. 28, Page Dep. at 18:12-19:1 ("their primary role is to investigate claims or indicators of fraud that might be present, and they are collaborative with our claims partners"); Ex. 30, Serafin Dep. at 74:20-22 ("I think investigating is a critical core piece of what an investigator's time should be spent doing, but naturally there is [sic] other duties that are critical . . . but if you were to pull the job description for an investigator, I think the core of it would be centered around the investigative activity."); Ex 24, Martinez[8] Dep. at 34:16-24 (Q: "So would you agree with me that the main job of the special investigator is to investigate claims and report what they investigated or what they found to the claims rep?" A: "Yes.").

Plaintiff David Deluca was employed as a special investigator from approximately April 2012 to May 2014.  Am. Compl., ¶ 3.  He was assigned to a territory that covered Santa Clara, Contra Costa, and Alameda Counties, and he reported to offices in San Jose and Concord, California.  Id.  Plaintiff Barry Francis was employed as a special investigator from approximately April 2006 to June 2016.  Id., ¶ 4.  He was assigned to cover San Francisco, Contra Costa, and San Mateo Counties, and reported to an office in Daly City, California.  Id.  Plaintiff Melissa Laughlin was employed as a special investigator from approximately December 2011 to September 2014 and covered territory on Long Island, New York.  Id., ¶ 5.  These named Plaintiffs, as with all other special investigators, were classified as exempt employees.  Am. Answer, ¶ 13.

### B.      Investigations Process

A claim is routed to SIU for investigation after being identified by Claims as a suspect file.  Ex. 31, Wedding Dep. at 87:2-88:6.  Sometimes the Claims representative will initially contact a special investigator to discuss whether a claim has fraud indicators[9] that warrant an investigation

---

[7] Chris Page has been a SIM since 2007.  Ex. 28, Page Dep. at 9:4-8.

[8] Richard Martinez was a SIM until 2014, then worked as a trainer at SIU, and has worked in "National QA" since 2015.  Ex. 24, Martinez Dep. at 9:21-10:5, 19:1-20:4.

[9] According to Farmers' Onboarding journal, "[i]ndicators are simply possibility factors that identify files requiring further investigation."  Ex. 6, SIU Onboarding Journal at FIE-DF00097.  There are common indicators for different industries.  For example, for vehicle theft fraud claims,

United States District Court
Northern District of California

and other times the Claims representative will submit the claim through a system called the assignment manager.  Id.; Ex. 6, Reyes Dep. at 68:17-70:1 (describing situation where Claims representative would call to obtain his opinion on whether a claim had a fraud indicator and should be referred to SIU for investigation).  If the claim is routed through the assignment manager, that manager system assigns the file to a special investigator based on their proximity to the claim, who then reviews the file to determine whether an investigation is warranted and if s/he is the person who will conduct the investigation.  Ex. 31, Wedding Dep. at 88:7-22.  A special investigator does not need to accept every claim that is referred to the SIU.  Ex. 25, Masuen[10] Dep. at 61:10-12 ("It's the investigator's job to take a look at that file and see if they think we can have any impact on that claim."); Ex. 22, Newell Decl., ¶ 6; Ex. 21, Hsieh Decl., ¶ 15 ("the decision to decline SIU involvement is my own" and she does not need to confer with her SIM before declining a file).  At times, a special investigator may close a file mid-investigation because s/he decided that the claim did not warrant SIU involvement.  Ex. 2, Francis Dep. at 85:17-25.

Once they have the file, special investigators contact the claim representative early on to consult about an investigation plan.  Ex. 28, Page Dep. at 31:15-32:1.  SIMs do not officially approve an investigation plan once it is drafted, although SIMs generally initially review them.  Id. at 32:2-7.  Each claim is unique and special investigators have "the freedom to tailor their tasks to that claim."  Ex. 13, Newell Dep. at 86:6-17.  Plans are subject to change depending on whether developments in the investigation warrant a new direction.  Ex. 6, Reyes Dep. at 75:20-76:23 (may need to make mid-investigation changes to the plan but would not need to seek approval first from Claims representative or SIM).

An investigation plan may include one or more of the following tasks: running background reports; taking detailed in-person statements; canvassing the relevant cite; following up with witnesses, police, and anyone else associated with the claim; reviewing cell phone records;

---

[10] Diana Masuen is a SIM who previously worked as a special investigator.  Ex. 8, Masuen Dep. at 19:2-5.

the National Insurance Crime Bureau has published a list of indicators, such as a temporary, recently issued, or out-of-state driver's license or claims for expensive contents in the vehicle at the time of the theft.  Ex. 7 at FIE-DF006652.

reviewing credit report; searching social media.  Ex. 5, SIU Investigations Presentation, FIE-DF007669 (describing SIU's investigative tasks).  Special investigators are expected to update their Claims partners as important developments occur in the course of their investigation.  Ex. 1, Quality Guidelines.

The special investigators create a file for each claim they investigate.  Ex. 28, Page Dep. at 18:21-22.  Within the file, they record their investigative activities and, at the end of the investigation, record a summary or conclusion about their investigative findings.  Id. at 18:23-19:1. The conclusions are "just a summary of the key points that [the special investigators] investigate."  Ex. 13, Newell[11] Dep. at 96:24-25.  "It may have what the indicators were.  It will have what the tasks were, what the results of the tasks were that the [special investigator] did that are relevant to the claim.  And it's just reporting the facts of what [SIU] found in the investigation in a concise manner to Claims."  Ex. 13, Newell Dep. at 97:2-6; Ex. 18, Ambrosio Dep. at 7-9 ("Because the claim file is based on fact . . . It's just strictly fact."); Ex. 13, Newell Dep. at 63:7-13 ("we just want to report the pertinent information . . . the information that explains were the indicators resolved, what were the results, and not a step-by-step . . . replay of the entire investigation . . . ").  Special investigators are not supposed to record their opinions in the file about whether fraud occurred or on any other issue, such as whether a witness was lying.  Ex. 28, Page Dep.  at 22:18-25, 23:5-20.  At times, special investigators report insureds to the underwriting department if they thought their investigation yielded risk advice.  Ex. 6, Reyes Dep. at 101:6-102:11 (provided risk advice to underwriting based on his own assessment without input from his supervisor); Ex. 15, Serafin Dep. at 128:19-129:15 (expected special investigators to report to underwriting if they encountered a risk in the course of performing their investigations); Ex. 12, Page Dep. at 121:17-122:9 (special investigators send risk advice to underwriting that they discover during investigations).

The Claims department has access to the file and can review it at any time.  Ex. 13, Newell Dep. at 97:7-10; Ex. 28, Page Dep. at 19:20-20:2.  The Claims representative uses the information

---

[11] Tom Newell has been a SIM since 1994.  Ex. 22, Newell Decl., ¶ 2.

United States District Court
Northern District of California

1  recorded in the file to inform their ultimate decision on whether or not to deny the claim, as the

2  Claims representative is ultimately responsible for making that decision.  Ex. 28, Page Dep. at

3  20:3-7, 16-17; Ex. 25, Masuen Dep. at 36:21-23 ("[T]he claims office is ultimately the one that

4  makes a decision on the claim.  We just provide the facts."); Ex. 9, SIU California Yearly Anti

5  Fraud 2017 at FIE-DF007607.

6           A Claims representative may "informally discuss" the investigation with the special

7  investigator or another member of SIU.  Ex. 28, Page Dep. at 9-12.  Mr. Serafin, the former SIU

8  director, testified that at the conclusion of an investigation the special investigator is expected to

9  have a conversation with the Claims representative responsible for the file so that the special

10  investigator "could convey context and what they observed and have a more detailed

11  conversation."  Ex. 30, Serafin Dep. at 77:12-14.  This conversation may include a "candid

12  discussion about what they observed, what they saw, and what they think the appropriate next

13  steps would be for that claim resolution."  Ex. 30, Serafin Dep. at 77:3-5.  Mr. Page, an

14  experienced SIM, acknowledged that special investigators might give their informal opinion on

15  whether to pay or deny a claim based on fraud, but that he would not expect them to do so because

16  "it's a fact-based investigation and I want them to steer away from their opinions on these things

17  as much as possible."  Ex. 28, Page Dep. at 69:23-70:15.  Mr. Page further acknowledged that

18  some Claims representatives, especially inexperienced ones, may press the special investigators

19  for their opinions.  Id.  Some special investigators provided testimony that they sometimes

20  provided informal opinions to Claims representatives about whether to pay a claim or not.  Ex. 4,

21  Daszko Dep. at 31:19-32:9 (would discuss the "ultimate legitimacy of the claim" with Claims

22  representatives about one-third of the time); Ex. 19, Bear Decl., ¶ 41 (when he was a special

23  investigator he "frequently had informal, verbal communications with the claims representative to

24  discuss relevant factual information about the ultimate legitimacy of the claim as well as my

25  factual observations relating to witness's credibility").  Other Plaintiffs testified that they did not

26  offer these informal opinions.  Ex. 3, Francis Dep. at 186:7-14 (in response to question about

27  whether to deny or pay claim, he would respond "That's a claims office decision."); Ex. 20,

28  Deluca Dep. at 41:8-41:12 (refused to offer conclusions to Claims representatives); Ex. 22,

Grimes Dep. at 51:12-52:5 (if asked, would tell Claims representative that "we are not allowed to give our opinion or tell them what we think should happen next").  Special investigators are neither trained to provide their opinions nor are they evaluated on giving them.  Ex. 18, Ambrosio Dep. at 115:10-12 (no training to give ultimate opinion on fraud and not evaluated on giving informal opinions); Ex. 28, Page Dep. at 70:16-19 (same).

In conducting their work, special investigators are encouraged to "think very independently" and determine in their discretion "how and what to investigate when they receive a claim."  Ex. 19, Bear Decl., ¶ 6; Ex. 22, Newell Decl., ¶ 8 ("I believe it is important to afford special investigators under my supervision the freedom and latitude to plan and conduct investigations in the manner they see appropriate based on the nature of the specific claim, including the particular indicators of fraud present in the claim file.").  SIMs do not micromanage the special investigators and special investigators largely work independently and from the field.  Ex. 7, Grimes Dep. at 94:22-95:8 (she was never given a daily task list and was expected to management her own workflow); Ex. 22, Newell Decl., ¶¶ 18 ("As a SIM, I have never directed or mandated that special investigators perform their investigations in a certain manner or sequence."), 19 (special investigators under his supervision are "remote or virtual employees who work out of their homes, in the field, and occasionally visit different Branch Claims Offices"); Ex. 21, Hsieh Decl., ¶ 5 ("So long as I get my work done, Ms. Masuen leaves me alone to schedule my workload, create my investigation plans, and to carry out my investigations as I decide."); Ex. 6, Reyes Dep. at 65:8-11 (worked from home 99% of the time); Ex. 2, Francis Dep. at 106:22-107:2 (primarily worked out on the field).  The special investigators maintained flexible schedules that were not dictated by their supervisors.  Ex. 2, Francis Dep. at 102:18-23 (testifying that he had no set schedule); Ex. 8, Masuen Dep. at 124:7-19 (explaining that special investigators under her supervision made their own schedules and were allowed flexibility to attend to personal obligations during the normal workday); Ex. 22, Newell Decl., ¶ 19 ("As SIM, I do not take any steps to monitor the whereabouts of an investigator on a daily basis.  How a special investigator chooses to spend his or time [sic] is their own decision.").  Special investigators are not prevented from taking meal breaks.  Ex. 21, Hsieh Decl., ¶ 27 ("As a special investigator, I am able to take a

1   break whenever I want to take a break during the day . . . No one at FIE has ever told me that I

2   should not take my meal break . . . "); Ex. 2, Francis Dep. at 222:11-16 (never told not to take a

3   meal or rest break).

C.      **Special Investigator Training, Quality Guidelines, and Audits**

Over time, Farmers has shifted the process it uses for evaluating the quality of SIU's

investigations, but there have always been guidelines against which investigations were reviewed.

Ex. 30, Serafin Dep. at 29:2-30:13.  Historically, before the U.S. District Court for the District of

Minnesota ruled that Farmers misclassified special investigators as administratively exempt under

the FLSA and California law in Fenton v. Farmers Ins. Exch., 663. F. Supp. 2d 718 (D. Minn.

2009), Farmers used a quality assurance (QA) system to audit special investigators' work that

provided a quantitative score for their performance.  Id. at 726 (noting that the QA guidelines

"explain in great detail how plaintiffs should approach dozens of issues that typically arise in the

performance and documentation of investigations").  Prior to around 2013, special investigators

conducted their investigations using a QA checklist, but special investigators have since stopped

using the checklist.  Ex. 30, Serafin Dep. at 112:22-113:20; Ex. 4, Daszko Dep. at 164:20-25.[12]

In approximately 2013 or 2014, SIU changed the QA reviews and standards to behavior-

based Investigative Quality ("IQ") reviews and standards and eliminated the checklist.  Ex. 30,

Serafin Dep. at 29:13-30:13; Ex. 14, Francis Files (contain numerical score for his files in 2014,

according to Plaintiffs, although the document is not dated).[13]   The purpose of the changes was

"to get rid of the checklist mentality" and eliminate the scoring of special investigators' work.  Ex.

18, Ambrosio Dep. at 63:5-15; Ex. 15, Serafin Dep. at 112:20-21 ("we went away from any kind

---

[12] Farmers claims that Mr. Daszko used a "leash" analogy to explain that his investigations are less constrained since the QA changes in 2013.  However, the portion of Mr. Daszko's deposition transcript that they cite (Ex. 4 at 92:13-18) does not contain that analogy.

[13] Mr. Serafin testified at his deposition about this transition away from QA to IQ.  He testified that he participated in a working group that devised these revisions and that he did not "believe when we were creating these we had any feeling that we were not in compliance with [the Fair Labor Standards Act," "[s]o, that wouldn't have factored in."  Ex. 30, Serafin Dep. at 50:17-51:5. Instead, his "vision and purpose in revising these was . . . really tied to evolving us to a place of behavior-based performance."  Id. at 51:5-7.  He testified that he was aware of the Fenton decision, but that it did not impact the instructions he gave to his working group about the QA revisions.  Id. at 43:5-17, 45:2-22.

of checklist and any kind of scoring").  Witnesses explained that the revisions to the quality standards and review process had the effect of reducing inapplicable and unnecessary work on a given investigation.  Ex. 31, Wedding Dep. at 144:12-17 (". . . at one time there was a requirement that field investigators had to do field work on every file, so that also would to the unnecessary work, and so that – I would say the teams where that was a requirement, there's no such requirement"); Ex. 30, Serafin Dep. at 112:8-114:17 (the changes helped special investigators move "through the process efficiently, thereby creating minimal delay and costing the company less money to get the proper resolution . . . if they weren't doing unnecessary tasks, then they should be probably more effective in how quickly they got to the right answers").

After the transition, SIU supervisors used quality guidelines to assess the special investigators' performance, which were provided to the special investigators for their reference.  Ex. 30, Serafin Dep. at 25:11-26:21.  These guidelines were called the SIU Investigation Quality Best Practices Guidelines.  Exs. 1-3 (these exhibits contain three different versions of the guidelines, the most recent version appears to be from 2015) (the "Guidelines").  The Guidelines cover timeliness, investigation, regulatory compliance, and documentation.  Exs 1-3 at 1.  In declarations supporting their motion for class certification, Plaintiffs Deluca, Francis, Daszko, O'Brien, and Stewart stated that the "SIU Quality Assurance Guidelines (QA)" "applied and controlled how special investigators worked on their files" throughout their employment.  Dkt. No. 69-9 (¶ 10).  Plaintiff Deluca explained that he tried to adhere to what the guidelines required and that he did not know if there was anything else he would have done that was not in the guidelines.  Ex. 3, Deluca Dep. at 110:19-111:23.

According to Plaintiffs, SIMs review a sampling of special investigators' files using a program called TeamThink that includes a standard set of review questions that include basic questions about the claim and investigation, as well as qualitative questions such as whether the "investigative thought process [was] proactive and efficient" and whether "the claim [was] handled within state regulatory requirements."  Exs. 12-13 (reviews from 2016 and 2017).[14]

---

[14] Plaintiffs cited deposition testimony from Thomas Newell that supposedly supported the statement that SIMs review about two claim files per month per special investigator using the

These reviews include the SIMs' comments and feedback, such as comments that the SIM "would be careful about putting in your opinion about what caused the damage.  Stick to reporting the facts only."  Ex. 12 at FIE-DF006600.  If a special investigator's file failed to meet an expectation, such as an expectation about timeliness of completion, an "exception" will be noted and, generally, discussed with the special investigator.  Ex. 28, Page Dep. at 46:2-25; Ex. 24, Martinez Dep. at 75:1376:2 (using TeamThink questionnaire as a tool for coaching special investigators).  During discovery, Farmers provided a report listing the results of hundreds of claims reviews.  Brome Decl., ¶ 3; Ex. 32 (184-page compilation of review comments).

Although SIMs appear to perform some degree of qualitative review of special investigators' files, there is evidence that each SIM was given discretion to perform quality reviews.[15]  Ex. 18, Wedding Decl., ¶ 15 ("SIMs periodically conduct a review of the open cases that a special investigator is handling . . . The quality review of claim files, however, is left to the discretion of the SIM at the local level.").  Michael Ambrosio testified that SIU discontinued regular quality reviews around 2014 because they had "consistently . . . high, high-quality reviews" and "at that point, we felt there was really no value."  Ex. 10, Ambrosio Dep. at 57:15-21.  From then on, SIU moved to "more of a spot checking, random checking, by the SIMs.  More of a trust but verify kind of approach versus a rigid review."  Ex. 10, Ambrosio Dep. at 58:6-8.  In addition to their own review, some SIMs, such as Diane Masuen, asks her special investigators to perform a peer review of the other special investigators' files.  Ex. 8, Masuen Dep. at 79:4-9.

Objective measures are tracked regarding the special investigators' productivity and impact.  These measures include the volume of claims closed by the special investigators, how long it takes to close files, and the dollar value of claims that are "deterred" by SIU's work.  Ex. 28, Page Dep. at 54:25-55:13, 55:23-57:2, Ex. 11 at FIE-DF002939; Ex. 30, Serafin Dep. at 13:4-25, 135:15-21.  A department outside of SIU, called National QA, has conducted audits of SIU

standardized questions in TeamThink, but the cited testimony (Dep. at 44:23-45:7) did not support that statement, nor was it related to it.

[15] Farmers cites Mr. Serafin's deposition for the proposition that "a SIM reviews only two claims per month for each investigator."  However, the citation provided – Ex. 15, Serafin Dep. at 31:6-18 does not support that statement.

United States District Court
Northern District of California

files.  Ex. 18, Ambrosio Dep. at 70:6-71:9.  Richard Martinez, who used to work in SIU and moved to National QA in 2015, explained that National QA used to randomly pull 120 files to review every quarter, which included SIU's contribution to the file, and generate a benchmark report on its findings.  Ex. 24, Martinez Dep. at 48:17-49:20.  The purpose of these audits, the results of which were only provided to SIU leadership, was to look at "overall work, overall trends and patterns that we are seeing in terms of . . . their teams [sic] behavior."  Ex. 14, Martinez Dep. at 58:21-59:14.  More recently, National QA has moved toward more targeted reviews, such as the use of private investigators and the effectiveness of the use of social media for investigations.  Ex. 24, Martinez Dep. at 57:6-23.

Starting in 2016, Special Investigators completed a three- to four-week training module called "SIU Fundamentals" intended to prepare them to fulfill their job responsibilities.  Ex. 10, SIU Fundamentals at FIE-DF006904; Pl. Supp. Br., Page Dep. at 112:7-113:16.  SIU Fundamentals training touches a wide range of relevant topics, including investigation basics (e.g., taking witness statements and checking databases), indicator lists, investigative quality, and regulatory compliance.  Id.  Before that time, Farmers used a new hire program called the Onboarding Journal.  Ex. 6.

### D.     Government Reporting Function

SIU is an internal investigatory function that is mandated by the State of California's Department of Insurance ("DOI").  Ex. 2, Francis Dep. at 97:8-12; Ex. 11, Stewart Dep. at 52:4-11.  Under certain circumstances, special investigators are expected to report claims to DOI or the National Insurance Crime Bureau ("NICB").  Ex. 25, Masuen Dep. at 84:13-16.  Reporting to these entities is required by state and federal law.  Ex. 18, Ambrosio Dep. at 91:23-92:16.  Special investigators receive training on how to properly complete the DOI and NICB reports and Farmers had guidelines for ensuring that referrals had all necessary information.  Ex. 18, Ambrosio Dep. at 93:1-12, Ex. 8, FIE-DF007374 (internal Farmers email providing tips for NICB and DOI referrals).  Claims are reported to these entities when there are unresolved fraud indicators after an investigation.  Ex. 25, Masuen Dep. at 86:1-10; Ex. 28, Page Dep. at 74:4-13; Ex. 22, Grimes Dep. at 47:9-14; Ex. 20, Deluca Dep. at 25:8-26:5.  In California, the technical standard is when one

United States District Court
Northern District of California

"reasonably believes or knows that a fraudulent claim is being made." Cal. Ins. Code § 1872.4(a).

Several SIU employees testified that they referred nearly all claims they investigated to DOI and/or NICB. Ex. 28, O'Brien Dep. at 107:8-21 (his best recollection was that he referred every claim to NICB); Ex. 29, Reyes Dep. at 77:17-78:4 (reported "essentially, almost all claims"). For some special investigators, their SIMs supervised some or most of their referrals to NICB and DOI. Ex. 22, Grimes Dep. at 47:22-48:5 (referrals were generally determined by special investigators but sometimes her manager directed her to refer claims that she would not have referred); Ex. 29, Reyes Dep. at 79:18-80:5 (same); Ex. 20, Deluca Dep. at 29:20-30:25) (asked SIM whether referral was appropriate "[m]ost of the time"). Once SIU makes a referral to NICB or DOI, it is up to that agency to decide how to handle the claim. Ex. 28, Page Dep. at 78:23-79:1.

In addition to referrals to NICB and DOI, a special investigator may report a claim to law enforcement to "shar[e] information" and "build rapport." Ex. 7, Grimes Dep. at 27:17-28:11 (would communicate with district attorneys in California in connection with investigations of workers compensation claims); Ex. 4, Daszko Dep. at 163:5-164:19.

**E.     Industry Events and Training for Claims Representatives**

Special investigators may provide training to Claims representatives about SIU's work and some special investigators attend industry meetings and events or conduct trainings for outside groups. Ex. 18, Ambrosio Dep. at 98:6-99:8 (a small number of special investigators provide training to Claims representatives and it is "encouraged, but not required"); Ex. 18, Ambrosio Dep. at 40:1-21 (some special investigators attended outside industry meetings). However, these events and trainings were not especially time consuming and were not a large portion of the tasks the special investigators performed as part of their job duties. Ex. 18, Ambrosio Dep. at 40:23-41:4 (for special investigators who attended industry meetings frequently they would spend "[o]nly a couple hours a month" at them); Ex. 18, Ambrosio Dep. at 100:15-101:3 (trainings occur once or twice a year for approximately 15-20 minutes).

**F.     Tracking Time Worked and Breaks**

There is evidence that special investigators worked over 40 hours per week to investigate

13

all of the files assigned to them.  Dkt. No. 69-9, Deluca Dec., ¶ 11; Francis Dec., ¶ 11; Daszko Dec., ¶ 11; O'Brien Dec., ¶ 11; Stewart Dec., ¶ 11 (stating that they "routinely worked over 40 hours per week" and that they "did not receive any overtime compensation for any of those hours").  Mr. Page, who is a SIM, testified at his deposition that he discourages special investigators from working over 40 hours a week but he "know[s] it happens."  Ex. 28, Page Dep. at 98:13.  He also stated, however, that "[i]t tends to balance itself out."  Ex. 28, Page Dep. at 98:13-14.[16]  Farmers does not keep records of the hours that the special investigators worked and, therefore, the special investigators may be in the best position to identify how many hours they worked.  Ex. 18, Ambrosio Dep. at 87:11-88:1; Ex. 28, Page Dep. at 100:22-24.  The pay stubs provided to special investigators do not indicate the number of hours worked.  Ex. 15, FIE-DF004398 (sample wage statement).

Farmers' meal and rest break policies did not provide second meal breaks for the exempt special investigators.  The policies either (1) applied to "all employees" (i.e., exempt and nonexempt) but only provided first meal breaks without mention of second meal breaks; or (2) only provided second meal breaks for nonexempt employees.  Dkt. No. 69-3.  Plaintiffs testified that they regularly worked through their meal periods without taking dedicated meal periods.  Ex. 21, Francis Dep. at 218:2-219:8 (worked through lunch); Ex. 20, Deluca Dep. at 149:12-24 ("I can't really say that I ever took lunch" and "a lot of times we'd eat right there [in the office] while we're working").

### G.      Laughlin's Employment

Melissa Laughlin, the New York Plaintiff, was employed as a special investigator from December 27, 2011 through August 29, 2014.  McCoy Decl., ¶ 17, Ex. 16 (Laughlin's responses to Requests for Admission state that she "admits that her employment with Farmers began around that time, but does not recall the specific date.  Plaintiff does not dispute that Farmers' records may show that her employment started on December 27, 2011."  She similarly did not dispute the

---

[16] Plaintiffs acknowledge that there is a dispute about the amount and frequency of overtime worked by the special investigators.  However, they contend that that issue goes to the amount of damages and not liability.

1   end date of her employment in her response to the Request for Admission.  The complaint was

2   filed on January 4, 2017, and Laughlin filed her consent to join form on October 23, 2017.

3   **II.      PROCEDURAL HISTORY**

4          On January 4, 2017, Plaintiffs filed this lawsuit contending that Farmers misclassified

5   them as overtime exempt.  Plaintiffs alleged claims under FLSA for overtime and California's

6   wage and hour laws for waiting time and wage statement penalties and premiums for missed meal

7   periods.  The Court conditionally certified Plaintiffs' FLSA claims on August 1, 2017 and

8   certified a class of special investigators who worked for Farmers in California on February 27,

9   2018.

10         On November 8, 2018, the Court granted in part and denied in part Plaintiffs' motion to

11  leave to amend their complaint.  The Court permitted Plaintiffs to amend the complaint to add

12  New York Plaintiff Melissa Laughlin and her New York state law claims but denied the addition

13  of Michigan Plaintiffs Timothy Bethel, Thomas Berry, and Mark Ritzema and their Michigan state

14  law claims.  Plaintiffs filed an amended complaint on November 13, 2018 to add Plaintiff

15  Laughlin's claims that Farmers violated New York's overtime law, New York Labor Law Art. 19,

16  §§ 650 et seq., and provided deficient notice and wage statements in violation of New York's

17  Wage Theft Act, New York Labor Law Art. 6, §§ 190 et seq.  On April 15, 2019, the Court

18  granted the parties' stipulation to dismiss other Farmers entities: Defendants Farmers Group, Inc.,

19  Farmers Insurance Company, Inc., and Farmers Specialty Insurance Company, Inc.

20  **III.     LEGAL STANDARD**

21         Summary judgment shall be granted if "the pleadings, discovery and disclosure materials

22  on file, and any affidavits show that there is no genuine issue as to any material fact and that the

23  movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Material facts are those

24  which may affect the outcome of the case.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242,

25  248 (1986).  A dispute as to a material fact is genuine if there is sufficient evidence for a

26  reasonable jury to return a verdict for the nonmoving party.  Id.  The court must view the facts in

27  the light most favorable to the non-moving party and give it the benefit of all reasonable

28  inferences to be drawn from those facts.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,

United States District Court
Northern District of California

475 U.S. 574, 587 (1986).  The court must not weigh the evidence or determine the truth of the matter, but only determine whether there is a genuine issue for trial.  See Balint v. Carson City, 180 F.3d 1047, 1054 (9th Cir. 1999).

A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion, and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Where the moving party will have the burden of proof at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party.  On an issue where the nonmoving party will bear the burden of proof at trial, the moving party can prevail merely by pointing out to the district court that there is an absence of evidence to support the nonmoving party's case.  Id.  If the moving party meets its initial burden, the opposing party "may not rely merely on allegations or denials in its own pleading;" rather, it must set forth "specific facts showing a genuine issue for trial."  See Fed. R. Civ. P. 56(e)(2); Anderson, 477 U.S. at 250.  If the nonmoving party fails to show that there is a genuine issue for trial, "the moving party is entitled to judgment as a matter of law."  Celotex, 477 U.S. at 323.

## IV.     DISCUSSION

### A.     Administrative Exemption

#### 1.     Legal Framework

An "employee employed in a bona fide administrative capacity" is exempt from overtime compensation requirements under the FLSA and applicable California and New York state law. To meet this exemption, Farmers must prove that the special investigators are:

(1) Compensated on a salary or fee basis at a rate of not less than $455 per week (or $380 per week, if employed in American Samoa by employers other than the Federal Government), exclusive of board, lodging or other facilities;

(1) Compensated on a salary or fee basis pursuant to § 541.600 at a rate per week of not less than the 40th percentile of weekly earnings of full-time nonhourly workers in the lowest-wage Census Region (or 84 percent of that amount per week, if employed in American Samoa by employers other than the Federal government), exclusive of board, lodging or other facilities. Beginning January 1, 2020, and every three years thereafter, the Secretary shall update the required salary amount pursuant to § 541.607;

United States District Court
Northern District of California

(2) Whose primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers; and

(3) Whose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance.

29 C.F.R. § 541.200(a). The dispute in this case focuses on whether the second and third elements concerning the special investigators' "primary duty" are satisfied.[17] Thus, this Court must address whether there are triable issues of fact as to whether the special investigators' primary duty (1) is "directly related to the management or general business operations" of Farmers, and (2) "includes the exercise of discretion and independent judgment with respect to matters of significance." Id. "Determination of an employee's primary duty must be based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole." Id.

The application of the administrative exemption is a mixed question of law and fact. "The nature of the employees' duties is a question of fact, and the application of the FLSA to those duties is a question of law." Ballaris v. Wacker Siltronic Corp., 370 F.3d 901, 910 (9th Cir. 2004). "Because the FLSA gives no 'textual indication' that its exemptions should be construed narrowly, 'there is no reason to give [them] anything other than a fair (rather than a 'narrow') interpretation.'" Encino Motorcars, LLC v. Navarro, __ U.S. __, 138 S. Ct. 1134, 1142 (2018) (quoting Scalia & B. Garner, Reading Law, at 363 (2012)). The administrative exemption is an affirmative defense, so Farmers bears the burden of proving that it applies in this case. Klem v. Cnty. of Santa Clara, California, 208 F.3d 1085, 1089 (9th Cir. 2000).

---

[17] There is no dispute among the parties that the FLSA test governs these motions. Farmers acknowledges that New York law incorporates the FLSA administrative exemption. 12 N.Y. Comp. Code R. & R. Regs. tit. 12, § 142-2.2; In re Novartis Wage & Hour Litig., 611 F.3d 141, 157 (2d Cir. 2010). It also recognizes that California's administrative exemption does not expressly incorporate the FLSA exemption, although it is "essentially the same as the FLSA and New York law." Def. Mot. at 21 n.143. Farmers states that the only difference is that California law requires exempt work to be performed more than 50% of the time, and that the employee must be "primarily engaged" in administrative tasks rather than having those tasks as his "primary duty," and that it otherwise mirrors the federal exemption. Farmers explains that there is no dispute that Plaintiffs spend more than 50% of their time on the allegedly administrative work of conducting investigations. Id. Therefore, the Court has not analyzed the New York or California exemptions separately, except as to the qualitative and quantitative distinction under California law, which is discussed on pages 25-26 of this Order.

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### 2.   Analysis of Exemption

#### a.   Primary Duty

The two disputed prongs of the administrative exemption both revolve around the special investigators' "primary duty."  The parties dispute what their primary duty is, although there is no dispute that Plaintiffs spend a majority of their time investigating potentially fraudulent claims.

The term "primary duty" means "the principal, main, major or most important duty that the employee performs."  29 C.F.R. § 541.700(a).  Facts to consider when determining the primary duty include but are not limited to: "the relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee."  Id.

Plaintiffs argue that their primary duty is conducting investigations.  Plaintiffs cite deposition testimony from various current employees of Farmers that their primary duty is to investigate, as well as the fact that the SIU Onboarding Journal and the Guidelines both emphasize the investigation of claims even if they also mention other tasks performed by the special investigators such as regulatory compliance.

Turning the focus onto their "primary value" or end goal rather than their main task, Farmers contends that the special investigators' primary duty is to protect Farmers' assets against the threat of insurance fraud or, in a slightly different characterization, combat fraud.  See Ferrell v. Gwinnett Cnty. Bd. of Educ., 481 F. Supp. 2d 1338, 1344 (N.D. Ga. Mar. 30, 2007) (elevating the plaintiffs' primary value" to the defendant over consideration of the time spent performing certain duties).  Farmers notes that insurance fraud is a multi-billion dollar threat.  See Cal. Ins. Code § 1871(b) ("fraudulent activities account for 15 to 20 percent of all auto insurance payments"), (h) ("Although there are no precise figures, it is believed that fraudulent activities account for billions of dollars annually in added health care costs nationally.").  Thus, Farmers asserts that all of Plaintiffs' tasks – from running their investigations to consulting with Claims representatives to reporting claims to NICB or DOI to training other personnel on fraud prevention and detection – should all be considered part of their primary duties.  If the Court were to give

1    controlling weight to an employee's "primary value," as Farmers argues, it is likely that nearly all

2    tasks an employee completes would be completed in service of her ultimate worth to the employee

3    organization, unless the employee undertook truly unrelated tasks.

4         Instead, Plaintiffs' primary job duty is to conduct investigations into claims that indicate

5    potential fraud, while their other responsibilities are secondary to that central task.  Take, for

6    example, Plaintiffs' responsibility to report potentially fraudulent claims to DOI and NCIB.  There

7    is undisputed evidence that nearly all claims that SIU investigates are referred to one or both

8    entities, and that making those referrals takes up a relatively small percentage of Plaintiffs' time.

9    See Calderon v. GEICO Gen. Ins. Co., 809 F.3d 111, 122 n.10 (4th Cir. 2015) (holding that

10   insurance investigators' primary duty "was the investigation of suspected fraud" and that referring

11   claims to law enforcement or the NICB or the defendant's underwriting department was not a

12   primary duty because "nothing in the record . . . would support a conclusion that these

13   responsibilities were any more than a minor part of the Investigators' jobs, either in their

14   importance or in the amount of the Investigators' time that they occupy").  That task serves

15   Farmers' overall goal of preventing and detecting insurance fraud and is necessary to comply with

16   Farmers' legal obligations.  But it is not central to the fundamental purpose of the special

17   investigators, which is to avoid the payment of fraudulent claims in the first place.  See Ex. 15,

18   Serafin Dep. at 123:5-8 (SIU's purpose is to "educate, identify, detect, [and] resist fraudulent

19   payments, or attempts to defraud the company through the insurance claims process").  If,

20   hypothetically, Farmers were to eliminate the duty to make referrals, the special investigators' jobs

21   would remain largely the same.

22        The same is true of the other less time-intensive tasks that Plaintiffs perform in the course

23   of their jobs.  Farmers highlights the fact that some special investigators train Claims

24   representatives and other personnel on issues related to fraud.  Since providing training is not a

25   requirement of the job and not all special investigators opt to give training, this activity cannot be

26   considered part of Plaintiffs' primary duty.  For essentially the same reasons, the provision of

27   informal opinions to Claims representatives about the legitimacy of a claim are also not Plaintiffs'

28   primary duty.  Some special investigators testified that they give informal opinions about whether

United States District Court
Northern District of California

19

to pay a claim, but there is also evidence that they are not trained to do so, it is not considered part of their job, some do not give these informal opinions, and their investigations and conclusions are factual only.

### b.    Directly Related

The next requirement[18] of the test considers whether an employee "perform[s] work directly related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment." 29 C.F.R. § 541.201(a).[19]   The regulation identifies the following non-exclusive list of functional areas of work that are "directly related to management or general business operations:"

> [T]ax; finance; accounting; budgeting; auditing; insurance; quality control; purchasing; procurement; advertising; marketing; research; safety and health; personnel management; human resources; employee benefits; labor relations; public relations, government relations; computer network, internet and database administration; legal and regulatory compliance; and similar activities.

29 C.F.R. § 541.201(b).

The purpose of this prong of the test "is 'to distinguish between work related to the goods and services which constitute the business' marketplace offerings and work which contributes to running the business itself."  McKeen-Chaplin v. Provident Savings Bank, FSB, 862 F.3d 847,

---

[18] Plaintiffs do not dispute that they perform office or non-manual work, which is another aspect of this prong of the test.

[19] Farmers cites 29 C.F.R. § 541.205(b) for the proposition that "the administrative operations of the business include the work performed by so-called white-collar employees engaged in 'servicing' a business as, for example, advising the management, planning, negotiating, representing the company, purchasing, promoting sales, and business research and control."  This regulatory provision no longer exists, as it was removed when the regulations were amended in 2004.  However, 29 C.F.R. § 203 provides administrative exemption examples that makes the same point.  For instance, "[e]mployees in the financial services industry generally meet the duties requirements for the administrative exemption if their duties include work such as collecting and analyzing information regarding the customer's income, assets, investments or debts; determining which financial products best meet the customer's needs and financial circumstances;  advising the customer regarding the advantages and disadvantages of different financial products; and marketing, servicing or promoting the employer's financial products."  29 C.F.R. § 541.203(b).  Also, "[h]uman resources managers who formulate, interpret or implement employment policies and management consultants who study the operations of a business and propose changes in organization generally meet the duties requirements for the administrative exemption."  29 C.F.R. § 541.203(e).

852 (9th Cir. 2017) (quoting DOL Wage & Hour Div. Op. Ltr., 2010 WL 1822423, at *3 (Mar. 24, 2010)).  "This requirement is met if the employee engages in 'running the business itself or determining its overall course of policies,' not just in the day-to-day carrying out of the business' affairs."  Bothell v. Phase Metrics, Inc., 299 F.3d 1120, 1125 (9th Cir. 2002) (quoting Bratt v. Cnty. of Los Angeles, 912 F.2d 1066, 1068 (9th Cir. 2010)).  However, this distinction can be "complicated" when the work at issue does not fall squarely on one side of this "administrative-production dichotomy."  McKeen-Chaplin, 862 F.3d at 852 (holding that the administrative exemption did not apply to mortgage underwriters); see also Bothell, 299 F.3d at 1127 ("[T]he dichotomy is but one analytical tool, to be used only to the extent it clarifies the analysis.  Only when work falls 'squarely on the production side of the line,' has the administration/production dichotomy been determinative.").  The California Supreme Court has also recognized the limitations of strict adherence of the administrative/production dichotomy.  See Harris v. Superior Court, 53 Cal. 4th 170, 188 (2011).

Plaintiffs rely on several relatively recent cases involving investigators to argue that because they conduct factual investigations, which are used by other employees, such as Claims representatives, to pay or deny a claim, they are engaged in the day-to-day business of Farmers' and are not administrative workers.  In Bratt, the Ninth Circuit affirmed the district court's determination that probation officers were not exempt as administrative employees under the FLSA where their "primarily responsibility" was "to conduct factual investigations of adult offenders or juvenile detainees and advise the court on their proper sentence or disposition within the system."  912 F.2d at 1069.  The court found that the district court had correctly interpreted the "directly related" prong of the exemption when it found that the probation officers' work "primarily involves the day-to-day carrying out of the business' affairs, rather than running the business itself or determining its overall course or policies," and therefore the exemption did not apply to the plaintiffs.  Id. at 1070.[20]

---

[20] Farmers homes in on the statement in Harris that "Bratt's persuasiveness is in doubt."  Harris, 53 Cal. 4th at 189.  In Bratt, the Ninth Circuit analogized the probation officers' work to the work of claims adjusters.  At the time, claims adjusters were classified as non-exempt, but they have subsequently been held to be exempt under the FLSA's overtime requirements under more recent

In <u>Calderon</u>, the Fourth Circuit considered whether the first prong foreclosed the application of the FLSA's administrative exemption for employees in GEICO's special investigations unit.  Calling it a "very close legal question," the Fourth Circuit ultimately found that GEICO had not met its burden to establish that the investigators' primary duty is directly related to management or general business operations and reversed the district court's determination that GEICO met that prong of the test.[21]  809 F.3d at 130.  Finding that the investigators' "primary duty consists of conducting investigations to resolve narrow factual questions, namely whether particular claims submitted to GEICO were fraudulent," in addition to "spend[ing] a small percentage of their time performing other duties," like training adjusters about fraud, the Fourth Circuit concluded that the investigators did not meet the exemption because they were not part of GEICO's management or running the business.  <u>Id.</u> at 118, 124.  Citing <u>Bratt</u>, the <u>Calderon</u> court concluded that the nature of the plaintiffs' investigations work was not "directly related to GEICO's management or general business operations" because the information they gathered was used in GEICO's "day-to-day processing of their employers' claims."  <u>Id.</u> at 126.

The <u>Calderon</u> court also noted that the role of fact investigator is more analogous to the "[p]ublic sector inspectors or investigators of various types, such as fire prevention or safety, building or construction, health or sanitation, environmental or soils specialists and similar employees," whose work the regulations identify as *not* satisfying the "directly related" element of the administrative exemption.  <u>Id.</u> at 127 (quoting 29 C.F.R. § 541.203(j)).  The regulations further provide that the exemption does not apply to the following public sector jobs:

> [P]olice officers, detectives, deputy sheriffs, state troopers, highway

---

federal regulations.  The <u>Harris</u> opinion seems to call <u>Bratt</u> into doubt for reasons that are not necessarily applicable here (i.e., neither party is analogizing the special investigators to the role of employees in a different business enterprise), but it does further highlight that the Court cannot rigidly apply the administrative/production dichotomy.

[21] To support its argument that the special investigators' primary duty is directly related to their business, Farmers cites to reasoning from the district court opinion in <u>GEICO</u> that found that the investigators' work was administrative in nature because "at the very least, [they] 'assist' GEICO claims adjusters in 'adjusting claims.'"  <u>Calderon v. GEICO Gen. Ins. Co.</u>, 917 F. Supp. 2d 428, 441 (D. Md. 2012).  On appeal, however, the Fourth Circuit reversed the district court's finding that the investigators' work satisfied that "directly related" to prong, as discussed above.

> patrol officers, *investigators,* inspectors, correctional officers, parole or probation officers, park rangers, fire fighters, paramedics, emergency medical technicians, ambulance personnel, rescue workers, hazardous materials workers and similar employees, regardless of rank or pay level, who perform work such as preventing, controlling or extinguishing fires of any type; rescuing fire, crime or accident victims; preventing or detecting crimes; *conducting investigations or inspections for violations of law; performing surveillance;* pursuing, restraining and apprehending suspects; detaining or supervising suspected and convicted criminals, including those on probation or parole; *interviewing witnesses;* interrogating and fingerprinting suspects; *preparing investigative reports;* or other similar work.

29 C.F.R. § 541.3(b)(1) (emphasis added).[22]

The Department of Labor ("DOL") has issued several opinion letters that consistently conclude that conducting factual investigations it not administrative work that falls within the scope of the exemption.  See DOL, Wage & Hour Div., Opinion Letter, FLSA 2018-13 (Jan. 5, 2018); DOL, Wage & Hour Div., Opinion Letter, FLSA 2005-21, 2005 WL 3308592 (Aug. 19, 2005); DOL, Wage & Hour Div., Opinion Letter, 1998 WL 852783 (Apr. 17, 1998); DOL, Wage & Hour Div., Opinion Letter, 1998 WL 852752 (Jan. 23, 1998); DOL, Wage & Hour Div., Opinion Letter, 1997 WL 971811 (Sept. 12, 1997).  Farmers downplays the significance of these DOL opinion letters, arguing that they are not persuasive because many of the employers' businesses are part of the investigations industry, but courts routinely cite these letters when evaluating the application of the administrative exemption to investigators who work within other industries, including the insurance industry.  Although not controlling, the DOL opinion letters are useful interpretative material for determining the application of the exemption.

In 2013, the Sixth Circuit took a different view and held in Foster v. Nationwide Ins., 710 F.3d 640 (6th Cir. 2013), that insurance special investigators who investigate suspicious claims satisfy the administrative exemption.  The Sixth Circuit affirmed the district court's entry of

---

[22] Other courts, such as Foster v. Nationwide Mutual Ins. Co., 695 F. Supp. 2d 748, 757-58 (S.D. Ohio 2010) and Mullins v. Target Corp., 2011 WL 1399262 (N.D. Ill. Apr. 13, 2011) (discussed in more detail below), declined to put undue weight on this regulation because it does not directly apply to private-sector employees.  They reasoned that the administrative exemption is "inapplicable to employees in law-enforcement roles because their agencies are in the business of conducting investigations, so their work falls 'squarely on the production side of the line.'" Mullins, 2011 WL 1399262, at *5 (quoting Foster, 695 F. Supp. at 758)).

1    partial summary judgment for Nationwide that the investigators' work was administrative in

2    nature and judgment in favor of Nationwide after a bench trial that their primary duty included the

3    exercise of discretion and independent judgment.  The Foster court analyzed the "directly related"

4    prong by considering whether the investigators' work was "ancillary" to the employer's general

5    business operations.  Id. at 646.  Because the investigators work is "integral to the claims adjusting

6    function, is performed in partnership with [claims adjusters], and involves making findings that

7    bear directly on the [claims adjusters'] decisions to pay or deny a claim," the "investigative work

8    that drives the claims adjusting decisions with respect to suspicious claims is also directly related

9    to assisting with the servicing of Nationwide's business."  Id.

10       Farmers argues that Foster is more persuasive and should be applied here because it was

11   decided after trial.  Moreover, Farmers notes that the Fourth Circuit stated that Calderon was a

12   "very close legal question" and suggests that it would come out the other way after the Supreme

13   Court's recent Encino decision repudiating a narrow construction of the FLSA exemptions.

14       Significantly, in 2017 the Ninth Circuit tacitly rejected the Sixth Circuit's "ancillary"

15   activity approach when it held in McKeen-Chaplin that mortgage underwriters who "perform work

16   that services the Bank's business, something ancillary to [the Bank's] principal production

17   activity," were not directly related to the general business operations so as to warrant applying the

18   administrative exemption.  McKeen-Chaplin, 862 F.3d at 852-53.  McKeen-Chaplin is consistent

19   with the Fourth Circuit's approach in Calderon in which it rejected the Sixth Circuit's conclusion

20   because it "fails to take into account that it is 'the nature of the work, not its ultimate

21   consequence,' that controls whether the exemption applies."  Calderon, 809 F.3d at 129 (citing

22   Desmond v. PNGI Charles Town Gaming, L.L.C., 564 F.3d 688, 692 (4th Cir. 2009) and 29

23   C.F.R. § 541.201(a) ("The phrase 'directly related to the management or general business

24   operations' refers to the type of work performed by the employee.") (emphasis added)).

25       The Court is persuaded by Bratt, Calderon, McKeen-Chaplin, and the regulations and

26   DOL's analysis that Plaintiffs' primary duty of conducting factual investigations that inform the

27   Claims representatives' ultimate determination of whether to pay claims does not qualify as

28   "directly related" to running Farmers' business or formulating or helping to execute policy such

24

United States District Court
Northern District of California

1    that this prong of the exemption is satisfied.  Plaintiffs' role is at least one step removed from

2    activity that would qualify under this factor.  While Plaintiffs support the Claims representatives

3    who are executing policy, they themselves are not doing so.  As Farmers notes in its motion,

4    "[f]raud investigation protects the company and assists Claims to adjust claims."  Def. Mot. at 26.

5    There is no record evidence to show that Plaintiffs' investigative work is the sole category of

6    information used by Claims representatives to make their determination about whether to pay

7    claims.  That Plaintiffs perform work that is ancillary to or relied upon by administratively exempt

8    employees does not make the investigators administratively exempt as well.  To conclude

9    otherwise would permit "the exemption to swallow the rule."  Roney v. United States, 790 F.

10   Supp. 23, 28 (D.D.C. 1992).

11        On reply, Plaintiffs raise the additional argument that Farmers cannot meet its burden on

12   California law to show that the special investigators' primary job duty was both qualitatively and

13   quantitatively administrative, as set forth in Harris v. Superior Court, 53 Cal. 4th 170, 181-82

14   (2011).  This minor distinction between the federal and state test arises from the fact that

15   California's Wage Order 4-2001 incorporates the pre-2004 amendments to the FLSA

16   regulations,[23] including former 29 C.F.R. § 541.205 which no longer exists.  Work that is

17   qualitatively administrative means work that is "administrative in nature," which includes "work

18   done by 'white collar' employees engaged in servicing a business.  Such servicing may include, as

19   potentially relevant here, advising management, planning, negotiating, and representing a

20   company."  Id. at 182.  The qualitatively administrative analysis is co-extensive with the FLSA

21   "directly related" analysis, as Plaintiffs concede in their reply, and Farmers has not satisfied that

22   element.  Under California law, a job is quantitatively administrative if it is "of substantial

23   importance to the management or operations of the business."  Id. at 181.  Farmers may be right

24   that Plaintiffs' work is substantially important to its operations because Plaintiffs' work contribute

25   to savings of approximately $50-60 million annually.  However, because Farmers has not carried

26

27   [23] The pre-2004 version of the regulations were "substantially the same as under the prior rule."
     DOL Opinion Letter, Wage & Hour Div., 2005 WL 3308592, at *1 (Aug. 19, 2005) (citing
28   Robinson-Smith v. Gov't Employees Ins. Co., 323 F. Supp. 2d 12 (D.D.C. 2004); McLaughlin v.
     Nationwide Mutual Ins. Co., 2004 WL 1857112 (D. Or. Aug. 18, 2004)).

1   its burden on the other qualitative element of the California exemption, summary judgment in

2   favor of Plaintiffs is warranted on the California and FLSA misclassification claims.

3                      **c.      Discretion and Independent Judgment**

4          As an additional and separate ground for summary judgment, the administrative exemption

5   is not fulfilled because Plaintiffs do not exercise the necessary discretion and independent

6   judgment in carrying out their primary duty.  The regulations counsel that "the exercise of

7   discretion and independent judgment involves the comparison and the evaluation of possible

8   course of conduct, and acting or making a decision after the various possibilities have been

9   considered."  29 C.F.R. § 541.202(a).  Whether an employee exercises discretion and independent

10  judgment is determined on a case-by-case basis and is based on the following factors:

> [W]hether the employee has authority to formulate, affect, interpret,
> or implement management policies or operating practices; whether
> the employee carries out major assignments in conducting the
> operations of the business; whether the employee performs work that
> affects business operations to a substantial degree, even if the
> employee's assignments are related to operation of a particular
> segment of the business; whether the employee has authority to
> commit the employer in matters that have significant financial impact;
> whether the employee has authority to waive or deviate from
> established policies and procedures without prior approval; whether
> the employee has authority to negotiate and bind the company on
> significant matters; whether the employee provides consultation or
> expert advice to management; whether the employee is involved in
> planning long- or short-term business objectives; whether the
> employee investigates and resolves matters of significance on behalf
> of management; and whether the employee represents the company in
> handling complaints, arbitrating disputes or resolving grievances.

20  29 C.F.R. § 541.202(b).

21         Plaintiffs argue that it is undisputed that Farmers has continued to prohibit their special

22  investigators from including subjective opinions and conclusions from their written reports.

23  Plaintiffs note that in Fenton the court concluded that the special investigators' primary duty does

24  not entail the exercise of discretion because their "subjective opinions and conclusions are

25  excluded from their written reports."  Fenton, 663 F. Supp. 2d at 727.  It found that the exclusion

26  of subjective opinions and conclusions outweighed the fact that the special investigators had some

27  discretion in how they conducted their investigations.  Id. at 726-27.  Because Plaintiffs' reports

28  still do not set forth conclusions, Plaintiffs urge the Court to adopt the Fenton analysis and find

United States District Court
Northern District of California

that this prong is not satisfied.  Moreover, Plaintiffs contend that they are not exercising discretion over "matters of significance" because they are merely applying well-established techniques to gather all facts, good and bad, and convey them to the Claims representative.  Plaintiffs ignore the fact that Farmers has implemented some changes to their duties in the years since the Fenton court's ruling, including elimination of the QA checklists that previously mandated that Plaintiffs take certain investigative steps in each investigation regardless of whether a particular suspicious claim called for them.

With respect to the factors listed above that are used to consider whether there is adequate discretion and judgment exercised, Plaintiffs contend that none apply.  They also argue that even those that facially seem to apply, such as "whether the employee provides consultation or expert advice to management" and "whether the employee investigates and resolves matters of significance on behalf of management," do not actually apply here.  They emphasize that the special investigators are merely responsible for gathering all relevant facts and passing them along to the Claims representatives so that they can make an ultimate determination.  Moreover, Plaintiffs distinguish the services they provide from advising "management" on the grounds that the special investigators only advise, if they can be considered advising at all, on individual claims and not on a broader company policy.

Farmers cites Roe-Midgett v. CC Servs., Inc., 512 F.3d 865 (7th Cir. 2008), in which the Seventh Circuit upheld entry of summary judgment for the defendant on whether a group of appraisers were administratively exempt.  The defendant contracted with insurance companies to provide claims processing services for auto, home, commercial, and farm policies.  Id. at 867.  The appraisers "provide claims adjustment services for [the defendant's] insurance company clients up to a $12,000 limit of claims settlement authority and represent the 'face' of [the defendant] to the countless claimants with whom they interact."  Id.  The Seventh Circuit summarized the appraisers' responsibilities:

> They spend much of their time in the field without direct supervision. They conduct on-site investigations of first- and third-party automobile insurance claims; interview claimants, witnesses, and law enforcement personnel; estimate loss; determine whether parts should be repaired or replaced; negotiate with mechanics and body shops and

draft final repair estimates; and settle claims up to the limit of their $12,000 settlement authority.

Id.  While the appraisers were not personally responsible for resolving issues of coverage or liability, the Seventh Circuit noted that they "routinely use their discretion and independent judgment to make choices that impact damage estimates, settlement, and other 'matters of significance'" because "their assessment of the damage and its cause bear directly on the ultimate coverage determination."  Id. at 874 (quoting 29 C.F.R. § 541.207(a)).  On balance, the court found that the appraisers' "day-to-day responsibilities mirror the duties the new regulations attribute to exempt 'claims adjusters'" and therefore the appraisers were also exempt.  Id. at 874-75.  While Plaintiffs' role is somewhat similar to the appraisers' job in Roe-Midgett, the appraisers' responsibilities are distinguishable in the degree of independence that they exercised.  Unlike the special investigators, in addition to investigating claims, which involved investigating claims *generally* and not merely for indicators of fraud as Plaintiffs do here, the appraisers also negotiated repairs, estimated loss, and settled claims.  These tasks require the exercise of judgment that goes far beyond investigating specific indications of fraud and reporting the outcome of that investigation to Claims representatives, who are much more closely aligned with the work of the appraisers in Roe-Midgett.

Another non-binding case cited by Farmers, Mullins v. Target Corp., 2011 WL 13991262 (N.D. Ill. Apr. 13, 2011), is somewhat more aligned with the facts of this case.  The plaintiff was a Target employee who identified and conducted investigations of fraud and theft at several Target stores.  Id. at *2.  The plaintiff reviewed information that had been entered into a database by Target store employees to identify instances where she believed fraud might be occurring.  Id. at *3.  Once she developed a potential case for investigation, she brought it to her supervisor for approval.  Id.  She then started running the investigation, seeking approval from her supervisor along the way as needed.  Id.  Eventually, if a strong enough case was made, the plaintiff brought the information she developed in her investigation to law enforcement.  Id.  On the discretion and judgment element, the court found that "[n]otwithstanding that there are only so many tactics to choose from, Investigators use their judgment to decide which ones to employ."  Id. at *7.  Thus, she "exercised independent judgment and discretion not only in selecting cases and in planning

out strategies and tactics for investigations, but in carrying out those investigations." Id. at *7.  In the same way that the Mullins plaintiff was responsible for planning her investigative steps, Plaintiffs did here, too, and here Plaintiffs functioned under a lower level of supervision. However, Mullins is also somewhat distinguishable because the plaintiff was responsible for identifying her own cases for investigation, whereas cases are typically referred to Plaintiffs by the Claims representatives, although Plaintiffs can decline them.

Focusing only on the special investigators' primary duty of conducting investigations of fraud indicators on referred claims, the record reflects that Plaintiffs act independently in planning and carrying out their investigations.  Post-Fenton, Farmers eliminated the checklists and initiated their IQ program, which left significantly more leeway in the hands of the special investigators to structure their investigations as they felt was appropriate for the claim involved.  Special investigators' custom of communicating and collaborating with the Claims representatives during the course of their investigations does not significantly reduce the independence they exercise. However, "mak[ing] decisions regarding the precise manner in which they conduct an investigation – creating action plans, deciding who to interview, what documents to review, what leads to follow, and whether to recommend hiring an expert – . . . are more appropriately viewed as choices among 'established techniques, procedures or specific standards described in manuals or other sources,'" that are not considered exercises of discretion and independent judgment with respect to matters of significance for purposes of the administrative exemption.  Ahle v. Veracity Research Co., 738 F. Supp. 2d 896, 907 (D. Minn. 2010) (quoting 29 C.F.R. § 541.202(a), (e)); see also Gusdonovich v. Business Info. Co., 705 F. Supp. 262, 265 (W.D. Pa. 1985) ("investigators were merely applying their knowledge and skill in determining what procedure to follow, which . . . is not the exercise of discretion and independent judgment contemplated by the regulation.").

On the record here, Plaintiffs do not exercise the necessary discretion and independent judgment in the way they report their findings to the Claims representatives.  Farmers urges the Court to adopt the Sixth Circuit's position in Foster that the investigators were focused on the "search[ ] for the truth" and that "[d]etermining truth requires 'factual findings,' a process that

necessarily required judgment and discretion." <u>Foster</u>, 710 F.3d at 648 (quoting <u>Foster v. Nationwide Mut. Ins., Co.</u>, 2012 WL407442, at \*19 (S.D. Ohio Jan. 5, 2012)).  In reaching the conclusion that the special investigators' findings of fact demonstrated the exercise of discretion, the Sixth Circuit distinguished <u>Fenton v. Farmers Ins. Exch.</u>, 663 F. Supp. 2d 718 (D. Minn. 2009) and another District of Minnesota case (<u>Ahle v. Veracity Research Co.</u>, 738 F. Supp. 2d 896 (D. Minn. 2010)), both of which found that the administrative exemption did not apply to insurance claim special investigators.  In particular, with respect to <u>Fenton</u>, the Sixth Circuit explained that the special investigators in that case were different because they provided both inculpatory and exculpatory evidence, all of which was then used by the claims representative to evaluate whether to pay the claim.  <u>Foster</u>, 710 F.3d at 640-50.  Thus, in contrast to the <u>Foster</u> special investigators who made "factual findings," the <u>Fenton</u> special investigators merely developed a factual record. <u>Id.</u> at 750.  This is a very fine distinction.  The evidence submitted here indicates that Plaintiffs investigated fraud indicators and turned over the facts they discovered during their investigation, without regard to whether the facts were good or bad.  Although Plaintiffs are no longer required to include every single fact in their report if it is not relevant to the claim review process, Plaintiffs are apparently not resolving factual disputes and presenting ultimate findings.  In this way, Plaintiffs' reports are closer to those that Farmers' special investigators created at the time of <u>Fenton</u> than those at issue in <u>Foster</u>.[24]  In sum, the record reflects a policy of reporting all pertinent information uncovered in the investigation, rather than the "factual findings" and "search for truth" that were so important in <u>Foster</u>.

Accordingly, the Court also grants summary judgment in favor of Plaintiffs on the administrative exemption on the alternative basis that Plaintiffs' primary duty does not reflect an exercise of discretion and independent judgment.

---

[24] The <u>Foster</u> court also held that the investigators' practice of giving informal opinions to claims representatives supported the conclusion that the investigators used discretion and independent judgment.  It explained that "[t]he discretion and independent judgment exercised in determining and communicating (albeit informally) the legitimacy or illegitimacy of suspicious claims referred for investigation is a matter of significance to Nationwide," even though the investigators were not officially allowed to convey their opinions about whether a claim was fraudulent.  <u>Id.</u> at 650.  This Court has concluded, however, that some Plaintiffs' decisions to give occasional or even frequent informal opinions is not part of their primary duty.

United States District Court
Northern District of California

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### B.      Willfulness & the Statute of Limitations

Plaintiffs also move for summary judgment on whether Farmers' violations of the FLSA were willful.  FLSA's statute of limitations is two years, unless an employer willfully violates the FLSA, which extends the statute of limitations to three years.  29 U.S.C. § 255(a); Alvarez v. IBP, Inc., 339 F.3d 894, 908 (9th Cir. 2003) (citing McLaughlin v. Richland Shoe Co., 486 U.S. 128, 135 (1988)).  Extending the statute of limitations to three years does not require a finding that the employer knowingly violated the FLSA.  Alvarez, 339 F.3d at 908.  "[R]ather, the three-year term can apply where an employer disregarded the very 'possibility' that it was violating the statute, although [the court] will not presume that conduct was willful in the absence of evidence."  Id. at 908-09 (citing Herman v. RSR Sec. Servs. Ltd., 172 F.3d 132, 141 (2d Cir. 1999) and Cox v. Brookshire Grocery Co., 919 F.2d 354, 356 (5th Cir. 1990)).  This requires "evidence of an employer's 'kn[owing] or [ ] reckless disregard for the matter of whether its conduct was prohibited by the statute.'"  Id. at 909 (quoting Richland Shoe, 486 U.S. at 133) (alteration in original).

Plaintiffs argue that Farmers acted willfully by failing to reclassify Plaintiffs, maintaining that the exempt was appropriate, and not changing the special investigator job after the Fenton court's summary judgment ruling in favor of the plaintiffs in 2009.  Plaintiffs' assertion that Farmers did not change the special investigators' job is inaccurate, as it eliminated the investigation checklist and converted its QA program to the IQ system around 2013 or 2014.  In 2015, Farmers also stopped performing routine audits of SIU's investigation.  Plaintiffs are correct, however, that Mr. Serafin, former SIU Director, testified in his deposition that the Fenton decision did not factor into the implementation of the IQ system because they believed they were in compliance with the FLSA and that the Fenton decision was wrongly decided.  The Fenton parties settled the case after summary judgment and an appeal was never taken.

While the Fenton court did not rely exclusively on the QA standards to find that the special investigators did not exercise sufficient discretion or independent judgment, it noted that the "QA review guidelines . . . explain in great detail how plaintiffs should approach dozens of issues that typically arise in the performance and documentation of investigations."  Fenton, 663 F. Supp. 2d

United States District Court
Northern District of California

1    at 726.  After <u>Fenton</u>, Farmers did not change its standards to allow special investigators to

2    provide their ultimate conclusions on whether a claim is fraudulent, but it did substantially revise

3    its guidelines in the years after the decision to eliminate the QA standards, thereby giving special

4    investigators greater control to tailor their investigation to a particular claim file.

5           Farmers contends that it made other changes to the special investigators' job, such as

6    determining whether SIU involvement is appropriate in the first place and requiring that

7    investigators only include relevant information in their final report, as opposed to an exhaustive

8    recitation of all the information gathered in their investigations.  Based on the record citations

9    Farmers provided to the court, both in its original briefing and the supplemental briefing supplied

10   after the hearing, it is not clear that these were actual changes implemented post-<u>Fenton</u>.  Instead,

11   Farmers largely relies on comparing statements in the <u>Fenton</u> decision that described the special

12   investigators' role at the time to standards that were in place in 2013 (<u>see</u> Ex. 18, Wedding Decl.,

13   ¶ 30, Ex. E) or vague testimony about moving from the QA guidelines to behavior-based standards

14   (<u>see</u> Ex. 15, Serafin Dep. at 50:3-52:1) to argue that the responsibilities and expectations of the

15   position evolved in the period after <u>Fenton</u>.  The Court cannot easily verify the <u>Fenton</u> court's

16   characterization of the special investigators' duties at that time because it does not have the

17   underlying evidence that was before the <u>Fenton</u> court.  Accordingly, this evidence is inconclusive

18   in establishing when or even whether these more specific job changes took place as Farmers

19   asserts.

20          Moreover, as to the information provided in the special investigators' final reports, the

21   2013 SIU QAE Explainer that Farmers submitted does not directly conflict with the QA guidelines

22   that support the <u>Fenton</u> court's determination that the special investigators provided an

23   "exhaustive file" at the end of their work.  <u>Fenton</u>, 663 F. Supp. 2d at 722, 726-27.  The pre-

24   <u>Fenton</u> QA guidelines stated that the special investigators' "purpose is to provide . . . factual

25   information that allows the Claims Professionals . . . to make good decisions, not tell them what

26   decision to make, or provide conjecture on what really happened."  <u>Id.</u> at 727.  The QA guidelines

27   required special investigators to include "[a]ll inculpating and exculpating information . . . in equal

28   detail and emphasis," and provided that "[o]pinions and/or speculative 'what if' scenarios are not

United States District Court
Northern District of California

1  acceptable." Id.  They further provided that "[a]ll reports must be attached to the file, even if the

2  result was no information available." Id.

3  The later guidelines cited by Farmers do not seem to represent a major change as to the

4  information Plaintiffs must provide to the Claims Representatives.  While the 2013 SIU QAE

5  Explainer stated that the documentation "should be as concise as reasonably possible," Ex. 18,

6  Wedding Decl., ¶ 30, Ex. E at FIE-DF000959, it also required inclusion of "their investigative

7  actions and any information developed that could potentially impact the claim decision." Id. at

8  FIE-DF000957.  More specifically, it must "list the relevant investigation actions completed,

9  identify and explain the SI's conclusions, summarize any significant findings, address the outcome

10  of identified indicators, detail any discrepancies or unresolved issues, and be supported by facts

11  (investigative activity)." Id. at FIE-DF000958.  Moreover, the 2013 guidelines were explicit that

12  special investigators were required to "evidence the SI's strategic thinking as they developed their

13  investigation.  This should include explaining why they pursued new leads, the reasons for

14  changes to the investigation plan, why they deemed any steps not valuable or decided to eliminate

15  others and the basis for their conclusions." Id. at FIE-DF000957.  As discussed in the background

16  section of this Order, the deposition testimony cited by the parties uniformly demonstrates that

17  Plaintiffs were not allowed to include their subjective opinions about a claim in their reports, just

18  as in the pre-Fenton era.  That Plaintiffs were expected to supply "reasonably concise" information

19  and documentation that focuses on "any information developed that could potentially impact the

20  claim" does not establish that Plaintiffs no longer had to provide all relevant claim-related

21  information to Claims Representatives, as it appears they were required to do in the period

22  reviewed by the Fenton court.

23  It is evident, however, that the legal landscape has been shifting on the exempt status of

24  insurance fraud investigators and that Farmers relied on the Sixth Circuit's decision in Foster.

25  Farmers did not completely alter Plaintiffs' position after the Fenton decision, although it did

26  make some changes.  Farmers stated that it believed the Fenton decision was wrongly decided (the

27  parties settled before appeal), and it maintained that their special investigators were appropriately

28  classified as exempt from overtime.  The Sixth Circuit's Foster decision in 2013 supported

1    Farmers' position before the statute of limitations period began to run, and the Fourth Circuit's

2    Calderon decision in 2015 created a circuit split that complicated case law on the application of

3    the administrative exemption.  In light of these competing facts, there are disputed material facts

4    concerning whether Farmers acted willfully in misclassifying the Plaintiffs.  Accordingly, the

5    Court denies Plaintiffs' motion for summary judgment on the willfulness issue.

6        **C.    Liquidated Damages**

7        Plaintiffs also move for summary judgment on whether Farmers is liable for liquidated

8    damages.  "An employer has the burden of showing that the violation of the [FLSA] was in good

9    faith _and_ that the employer had reasonable grounds for believing that no violation took place.

10   Absent such a showing, liquidated damages are mandatory." Bratt, 912 F.2d at 1071 (quoting

11   Equal Employment Opportunity Comm'n v. First Citizens Bank, 758 F.2d 397, 403 (9th Cir.

12   1985)) (emphasis in original).  This test is composed of subjective and objective components. Id.

13   at 1071-72.  "To satisfy the subjective 'good faith' component, the [defendant was] obligated to

14   prove that [it] had 'an honest intention to ascertain what [FLSA] requires and to act in accordance

15   with it." Brock v. Shirk, 833 F.2d 1326, 1330 (9th Cir. 1987) (per curiam).  "The additional

16   requirement that the employer have reasonable grounds for believing that [its] conduct complies

17   with the Act imposes an objective standard by which to judge the employer's behavior."

18       As discussed above regarding willfulness, Farmers had reasonable grounds for believing

19   that it was in compliance with the FLSA in classifying Plaintiffs as exempt.  On the issue of its

20   subjective good faith, Farmers has shown that it made changes to the special investigator position

21   after Fenton, largely in the form of eliminating the QA checklist.  Farmers organized a working

22   group in 2011, two years after Fenton, to evaluate the investigator position.  While Mr. Serafin

23   testified that the Fenton decision was not a factor in switching to the IQ system and away from the

24   QA review and the investigation checklist, he also provided testimony that Farmers believed the

25   Fenton decision was wrongly decided and Plaintiffs' exempt status was lawful.  On this record, the

26   Court declines to enter summary judgment in favor of Plaintiffs on the availability of liquidated

27   damages.

28

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

### D.      Calculation of FLSA Damages

Plaintiffs ask the Court to award FLSA damages at a rate of 0.5x versus 1.5x regular pay. The standard rate for compensating for overtime hours under the FLSA is "at a rate not less than one and one-half times the regular rate at which [the employee] is employed."  29 U.S.C. § 207(a).

The origin for this request is 29 C.F.R. § 778.114(a), which incorporates the "fluctuating workweek" ("FWW") theory for calculating damages.  The FWW theory applies to "[a]n employee employed on a salary basis [who] may have hours of work which fluctuate from week to week and the salary may be paid him pursuant to an understanding with his employer that he will receive such fixed amount as straight time pay for whatever hours he is called upon to work in a workweek, whether few or many."  29 C.F.R. § 778.114(a).  It is applicable where "there is a clear mutual understanding of the parties that the fixed salary is compensation (apart from overtime premiums) for the hours worked each workweek, whatever their number, rather than for working 40 hours . . . and if he receives extra compensation, in addition to such salary, for all overtime hours worked at a rate not less than one-half his regular rate of pay."  Id.  Under these circumstances, the regulation provides that "[p]ayment for overtime hours at one-half such rate in addition to the salary satisfies the overtime pay requirement because such hours have already been compensated at the straight time regular rate, under the salary arrangement."  Id.  Overtime pay must be made contemporaneously with employee's regular pay.  29 C.F.R. §778.114(c) ("Where all the facts indicate that an employee is being paid for his overtime hours at a rate no greater than that which he receives for nonovertime hours, compliance with the Act cannot be rested on any application of the fluctuating workweek overtime formula.").  This regulation codified the Supreme Court's decision in Overnight Motor Transport Co. v. Missel, 316 U.S. 572, 580 (1942), which approved alternative overtime compensation methods for employees who are paid fixed wages regardless of the number of hours they work.

The parties disagree over whether this regulation applies to a misclassification case.  The Ninth Circuit has not addressed the issue, although the First, Fourth, Fifth, Seventh, Tenth, and Eleventh Circuits have all found that FWW may be used to calculate damages where employees are misclassified.  See Valerio v. Putnam Assocs., Inc., 173 F. 3d 35 (1st Cir. 1995); Desmond v.

PNGI Charles Town Gaming, LLC, 630 F. 3d 351 (4th Cir. 2011); Blackmon v. Brookshire Grocery Co., 835 F.2d 1135 (5th Cir. 1988); Urnikis-Negro v. Am. Family Prop. Servs., 616 F. 3d 665 (7th Cir. 2010); Clements v. Serco, Inc., 530 F. 3d 1224, 1230-31 (10th Cir. 2008). Some of these courts have reasoned that the regulation only requires that the employer and employee have a "clear mutual understanding" that while "the employee's hours may vary, his or her base salary will not." Clements, 530 F.3d at 1230. However, the Tenth Circuit noted that the regulation does not require that the parties agree on how "overtime premiums would be calculated." Id.; see also Valerio, 173 F. 3d at 38-40; Blackmon, 835 F. 2d at 1138-39. Other courts have relied on Missel to hold that the FWW can be applied retroactively in misclassification cases if the plaintiffs' wages were intended to compensation her for all hours worked, regardless of the number worked in a given week. Urnikis-Negro, 616 F.3d at 681; see also Desmond, 630 F. 3d at 354-57.

While the Ninth Circuit has not reached the issue, numerous district courts within the Ninth Circuit have come to the contrary conclusion that this regulation cannot be applied retroactively to a misclassified worker because she and her employer could not have a "clear mutual understanding" about the payment of overtime. Boyce v. Independent Brewers, 223 F. Supp. 3d 942 (N.D. Cal. 2016), following other district courts within the Ninth Circuit, rejected the out-of-circuit holdings as contrary to the full text of the regulation. As Boyce points out, the regulation provides that the employees and employer have a "clear mutual understanding . . . that the fixed salary is compensation (apart from overtime premiums) for the hours worked each workweek." 29 C.F.R. § 778.114(a). It reasoned persuasively that "[i]n a misclassification case, the parties entered into an agreement on the presumption that the employee was not entitled to any overtime premiums and, therefore, there could not have been any clear mutual understanding that the compensation being provided did not include such premiums." Boyce, 223 F. Supp. 3d at 946; see also Zulewski v. Hershey Co., 2013 WL 633402, at *5 (N.D. Cal. Feb. 20, 2013) (if the employees were "found to be misclassified as exempt employees, the inquiry regarding whether individual [employees] 'consented' to a FWW is improper because when employees are misclassified, they have unwittingly agreed to forego their entitlement to overtime—a right which cannot be waived"); Russell v. Wells Fargo & Co., 672 F. Supp. 2d 1008, 1014 (N.D. Cal. Nov.

17, 2009) ("an effective clear mutual understanding is absent in misclassification cases").

Moreover, the regulation requires the contemporaneous payment of overtime, which is absent, by definition, in misclassification cases.  See Boyce, 223 F. Supp. 3d at 946; Russell, 672 F. Supp. 2d at 1012.

The Court finds this reasoning more persuasive based on the language of the rule.  Thus, the Court grants Plaintiffs' motion for summary judgment as to calculating overtime based on 1.5x wages.

### E.      Laughlin's FLSA Claim

Farmers moves for summary judgment on Plaintiff Laughlin's FLSA claim on the grounds that it is time barred because her employment ended more than three years before she filed her notice of consent to join.  Partlow v. Jewish Orphans' Home of So. Cal., Inc., 645 F.2d 757, 760 (9th Cir. 1981) ("the FLSA statute of limitations continues to run until a valid consent is filed"), abrogated on other grounds by Hoffmann-LaRoche v. Sperling, 493 U.S. 165 (1989).   The undisputed evidence supports Farmers' position and Plaintiffs have not opposed this aspect of Farmers' motion.  Thus, the Court grants Farmers' motion for summary judgment on Plaintiff Laughlin's FLSA claim.

### F.      Derivative State Law Claims

#### 1.      California Labor Code Section 203 Waiting Time Penalties

California law requires employers to pay all wages due at the time of an employee's termination or within 72 hours of the employee's resignation.  Cal. Lab. Code §§ 201, 203.  If an employer willfully fails to pay wages due at termination, it must pay penalties.  Cal. Lab. Code § 203.  "'[W]illful' merely means that the employer intentionally failed or refused to perform an action *which was required to be done*."  Kao v. Holiday, 12 Cal. App. 5th 947, 963 (Cal. Ct. App. 2017) (quoting Barnhill v. Robert Saunders & Co., 125 Cal. App. 3d 1, 7 (1981)) (emphasis in original).  "[A] good faith dispute that any wages are due will preclude imposition of waiting time penalties . . . "  Id. (quoting Cal. Code Regs., tit. 8, § 13520).

For the reasons discussed above, Plaintiffs have failed to carry their burden to show that Farmers acted willfully in misclassifying Plaintiffs, which would also forestall a finding that

37

1    Farmers willfully failed to pay wages due on time because it did not believe that overtime was

2    due.  Because there is a triable issue of fact on willfulness, the Court declines to grant summary

3    judgment in favor of Plaintiffs on this issue.

### 2.    California Meal Periods

5        Plaintiffs contend that Farmers is liable for failure to maintain a policy providing a second

6    meal period when its special investigators worked 10 or more hours in one day and move for

7    summary judgment on this claim.[25]  Under California law, an employer must generally "provide

8    an employee a 30-minute meal break for a work period of more than five hours and a second 30-

9    minute meal break for a work period of more than 10 hours per day with certain specified

10   waivers."[26]  Bradley v. Networkers Int'l, LLC, 211 Cal. App. 4th 1129, 1149 (Cal. Ct. App. 2012)

11   (citing Cal. Lab. Code § 512(a); Cal. Code Regs., tit. 8, § 11040(11)).  "If an employer fails to

12   provide an employee [the required] meal period or rest period . . . , the employer shall pay the

13   employee one additional hour of pay at the employee's regular rate of compensation for each work

14   day that the meal . . . period is not provided."  Id. (Cal. Lab. Code § 226.7(b) [now subd. (c)]).

15       The undisputed evidence is that Farmers' meal break policies did not expressly provide for

16   second meal breaks for exempt employees, thereby excluding Plaintiffs who were uniformly

17   classified as exempt.  However, one of the policies provided to the Court did permit second meal

18   breaks for non-exempt employees.

19       When an employer "adopts a uniform policy authorizing and permitting only one . . . break

20   . . . when two are required – it has violated the wage order and is liable."  Brinker Rest. Corp. v.

21   Superior Court, 53 Cal. 4th 1004, 1033 (2012).  A corollary to this rule is that "when an employer

22   has not authorized and not provided legally-required meal and/or rest breaks, the employer has

23   violated the law," regardless of whether an employee may have actually taken the break during the

24   work day.  Bradley, 211 Cal. App. 4th at 1152.

25

26   [25] At the hearing on this motion, Plaintiffs confirmed that they are no longer pursuing their rest
27   break claim.

28   [26] Pursuant to the Industrial Welfare Commission Wage Order 4-2001, the meal and rest break
     requirements do not apply to exempt employees.

United States District Court
Northern District of California

The parties argue past themselves on this issue.  Farmers contends that it is clear that Plaintiffs understood that they were permitted to take second meal breaks if they worked more than 10 hours, noting that special investigators primarily worked from home and the field and controlled their own schedules and that Plaintiffs admitted that they were not prevented from taking meal breaks when they wanted to do so.  See Brinker, 53 Cal. 4th at 1036 (an "employer satisfies [its] obligation if it relieves its employees of all duty, relinquishes control over their activities and permits them a reasonable opportunity to take an uninterrupted 30-minute break, and does not impede or discourage them from doing so").  Plaintiffs theory, however, is that Farmers' policy was unlawful because it did not specifically allow the purportedly misclassified special investigators to take a second meal break, even though at least one version of the policy permitted non-exempt employees to take second meal breaks.

As discussed in Section I.F, one version of the break policy provides for a second meal break.  This raises a triable issue of fact on this claim.  The undisputed record shows that Farmers' policy may have provided the required break, although it is not clear when and to whom this one policy applied.  Accordingly, the Court denies Plaintiffs' motion for summary judgment on the meal break claim.

### 3. Itemized Wage Statements (CA, NY) & Information About Compensation (NY)

Plaintiffs move for summary judgment on their claims that Farmers failed to provide Plaintiffs with the itemized wage statements that are required under New York and California Law.  See Cal. Lab. Code § 226(a)(2); N.Y. Lab. Law § 195(3).  In addition, Plaintiffs also move for summary judgment on their New York state law claim that Farmers failed to provide Plaintiff Laughlin with required information about the timing, method, and amount of pay when she was hired, as required by New York Labor Law § 195(1).  Violation of all three of these laws subject the employer to penalties.  See Cal. Lab. Code § 226(e), N.Y. Lab. Law §§ 198(1-b), 198(1-d).

The undisputed evidence shows that Farmers did not track Plaintiffs' hours worked, much less include those hours on their pay records.  Farmers acknowledges in its motion that the California itemized wage statement claims are derivative of and rise or fall with the FLSA claim.

1    With respect to the New York claims only, Farmers argues that Laughlin's New York

2  claims should be dismissed because the Court should decline to exercise supplemental jurisdiction

3  over them now that it has dismissed her FLSA claim as time-barred.  At the hearing, Plaintiffs

4  asserted that there likely was diversity jurisdiction over Laughlin's New York claims but that, in

5  any event, the Court should continue its exercise of supplemental jurisdiction over Laughlin's

6  claims.

7    In a post-hearing brief field by Plaintiffs they contend that "a preliminary damages

8  calculation" shows that Laughlin's damages will exceed $75,000.  They explain that her salary

9  was approximately $80,000 per year ($1,538.46 per week and $38.46 per hour).  Her overtime rate

10  (1.5x) is $57.69.  Laughlin estimates that she worked approximately 15 hours of overtime per

11  week, so that her weekly wage loss was $865.35 before liquidated damages are taken into account.

12  She is eligible for 136 weeks overtime under New York law, so without liquidated damages her

13  maximum damages are $117,687.60.  Farmers admitted in its answer to the operative complaint

14  that its principal place of business is in Los Angeles, and Plaintiffs alleged in their complaint that

15  Laughlin is a resident of Levittown, New York.

16    Plaintiffs did not supply a declaration from Laughlin attesting to these damages estimates

17  and they did not plead allegations about her damages in the complaint, although Farmers did not

18  file a brief challenging these numbers.  "When a plaintiff files suit in federal court, [the Ninth

19  Circuit] use[s] the 'legal certainty' test to determine whether the complaint meets § 1332(a)'s

20  amount in controversy requirement."  Naffe v. Frey, 789 F.3d 1030, 1039 (citing Pachinger v.

21  MGM Grand Hotel-Las Vegas, Inc., 802 F.2d 362, 363-64 (9th Cir. 1986)).  Using this test, "'the

22  amount in controversy is determined from the face of the pleadings,'" which "means a federal

23  court has subject matter jurisdiction unless 'upon the face of the complaint, it is obvious that the

24  suit cannot involve the necessary amount.'"  Geographic Expeditions, Inc. v. Estate of Lhotka ex

25  rel. Lhotka, 559 F.3d 1102, 1106 (9th Cir. 2010) (quoting Crum v. Circus Circus Enters., 231 F.3d

26  1129, 1130 (9th Cir. 2000)).

27    The allegations of the complaint support Plaintiffs' contention that the Court has diversity

28  jurisdiction over Laughlin's claims.  The complaint generally alleges the contours of Plaintiffs'

United States District Court
Northern District of California

40

1    job as special investigators.  It also alleges that Plaintiffs Francis and Deluca worked at least 10

2    and 15 hours of overtime per week, respectively, and that other special investigators regularly

3    worked over 40 hours per week.  This supports Laughlin's estimate that she worked approximately

4    15 hours of overtime per week.  The complaint also alleges that Laughlin worked for Farmers for

5    close to three years from approximately December 2011 to September 2014.  From these

6    allegations and the information Plaintiffs supplied after the hearing, it is far from a legal certainty

7    that the amount of controversy is not met on Laughlin's state law claims.

8            Even if the Court did not have diversity jurisdiction, the Court would exercise

9    supplemental jurisdiction over Laughlin's state law claims.  Pursuant to the supplemental

10   jurisdiction statute,

> [D]istrict courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if –
> (1) the claim raises a novel or complex issue of State law,
> (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
> (3) the district court has dismissed all claims over which it has original jurisdiction, or
> (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

15   28 U.S.C. § 1367(c).  Farmers argues that subsection (c)(3) applies here because the Court is

16   dismissing Laughlin's FLSA claim as time-barred, which is the only federal claim she asserts.

17           When one of the four prongs of 28 U.S.C. § 1367(c) is applicable, courts consider the four

18   factors of economy, convenience, fairness, and comity when deciding if they will continue to

19   maintain supplemental jurisdiction.  See Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350

20   (1988) ("When the balance of these factors indicates that a case properly belongs in state court, as

21   when the federal-law claims have dropped out of the lawsuit in its early stages and only state-law

22   claims remain, the federal court should decline the exercise of jurisdiction by dismissing the case

23   without prejudice.").

24           This case is advanced.  After the Court enters its summary judgment order, the parties will

25   likely need to complete some discovery, as reflected by the case schedule which incorporates a

26   period of post-summary judgment discovery.  After that, however, the case will proceed to trial.

27   In addition, Laughlin's claims almost entirely overlap with the claims of the other Plaintiffs, all of

28

United States District Court
Northern District of California

which remain in this case.  Thus, while Laughlin's own FLSA claim will be dismissed, the other

Plaintiffs' federal claim remains.  At this point, discovery on Laughlin's state law claims has

likely been taken and, if any discovery remains on her claims, it will only add a small, incremental

burden to whatever discovery must be taken on the other substantially identical claims of the other

Plaintiffs.  This significant overlap between the claims means that maintaining this case in federal

court is the more efficient option, and there is no special state law expertise needed to adjudicate

the claims.  In this way, comity is not necessarily well-served by dismissing Laughlin's claims and

requiring her to refile in New York state court, particularly given the advanced procedural posture

of this case.  While Laughlin's claims have only been in this case since November 2018, they rest

largely on litigation surrounding the FLSA claims which has been in litigated since January 2017.

While the "usual case" might warrant declining to exercise supplemental jurisdiction when a

plaintiff's federal claims are dismissed, Carnegie-Mellon, 484 U.S. at 351 n.7, the balance of the

relevant factors does not justify doing so in this case.

Accordingly, because the Court has granted summary judgment in favor of Plaintiffs on

the administrative exemption, the Court also grants their motion for summary judgment on the

California itemized wage statements claim.  Further, the Court will continue to exercise

supplemental jurisdiction over Laughlin's New York state claims and grants summary judgment in

her favor on the itemized wage statements and the claim that Farmers failed to provide Plaintiff

Laughlin with required information about the timing, method, and amount of pay in violation of

New York Labor Law § 195(1).  Therefore, the Court also grants summary judgment in favor of

Plaintiff Laughlin on her state law claims.

### 4.    California Unfair Competition Law

Farmers moved for summary judgment on Plaintiffs' California UCL claim on the grounds

that it is derivative of their claim that Farmers unlawfully withheld overtime due to Plaintiffs'

misclassification.  See Price v. Starbucks Corp., 192 Cal. App. 4th 1136, 1147 (Cal. Ct. App.

2011) (granting summary judgment on derivative UCL claim fails when the underlying causes of

action failed).  Plaintiffs did not move for summary judgment on this claim.

The Court has granted Plaintiffs' motion for summary judgment on the application of the

1    administrative exemption, so the Court denies Farmers' motion for summary judgment on the

2    UCL claim.

3         **G.      Trial Plan**

4         Should issues remain for trial, Farmers asks the Court to require Plaintiffs to propose a trial

5    plan that explains how the remaining disputed issues can be tried manageably with collective

6    evidence.  The parties are already scheduled to appear before the Court at a case management

7    conference on July 2, 2019.  One week in advance, the parties shall file a joint case management

8    statement that includes Plaintiffs' proposed trial plan for the remaining issues and Farmers must

9    provide its response to that plan.

10   **V.    CONCLUSION**

11        For the reason set forth above, the Court resolves the cross motions for summary judgment

12   as follows:

13   • GRANTS Plaintiffs' motion for summary judgment on the administrative exemption and
        DENIES Farmers' cross motion for summary judgment on the administrative exemption.

14   • DENIES Plaintiffs' motion for summary judgment on willfulness.

15   • DENIES Plaintiffs' motion for summary judgment on liquidated damages.

16   • GRANTS Plaintiffs' motion for summary judgment on the calculation of FLSA damages
        at 1.5x.

17   • GRANTS Farmers' motion for summary judgment on Plaintiff Laughlin's FLSA claim.

18   • DENIES Plaintiffs' motion for summary judgment on the Section 203 waiting time
        penalties.

19   • DENIES Plaintiffs' motion for summary judgment on the meal period claim.

20   • GRANTS Plaintiffs' motion for summary judgment on the itemized wage claims under
        New York (N.Y. Lab. Law § 195(3)) and California Law (Cal. Lab. Code § 226(a)(2)) and
21      the claim that Farmers failed to provide Plaintiff Laughlin with required information about
        the timing, method, and amount of pay when she was hired, as required by New York
22      Labor Law § 195(1).

23   • DENIES Farmers' motion for summary judgment on the California unfair competition law
        claim.

24

25        //

26        //

27        //

28

         United States District Court
         Northern District of California

1      **IT IS SO ORDERED.**

2   Dated: May 15, 2019

ELIZABETH D. LAPORTE
United States Magistrate Judge

United States District Court
Northern District of California

44